RESOLUCIÓN
Atendida la solicitud de certiorari presentada por la parte peticionaria de epígrafe, se provee “no ha lugar”.
Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado Señor Kolthoff Caraballo emitió una opinión de conformidad, a la que se unieron la Jueza Asociada Señora Pabón Charneco y el Juez Asociado Señor Rivera García. La Juez Asociada Señora Rodríguez Rodríguez emitió un voto particular disidente, al que se unen el Juez Presidente Señor Hernández Denton, la Jueza Asociada Señora Fiol Matta y el Juez Asociado Señor Estrella Martínez.
(Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

*405 Opinión de conformidad emitida por el
Juez Asociado Señor Kolthoff Caraballo, a la cual se unen la Jueza Asociada Señora Pabón Charneco y el Juez Asociado Señor Rivera García.
Ciertamente es correcta la decisión tomada por la mayoría de este Tribunal en el presente caso. Entiendo sabio y correcto en Derecho que, al igual que determinó el Tribunal de Apelaciones, nos abstengamos de intervenir con la determinación del Tribunal de Primera Instancia (TPI).
I
Los hechos concernientes a esta controversia se detallan a continuación, conforme surgen del expediente y de la Sentencia que con relación a esta controversia emitimos el 30 de junio de 2011.
El 23 de diciembre de 2009, en el contexto de un pleito de divorcio, la peticionaria, Sra. Jossette Machargo Olivella, y el recurrido, Sr. Fernando Martínez Schmidt, suscribieron una Estipulación de Custodia, Patria Potestad y Relaciones Paterno Filiales para sus dos hijas gemelas menores de edad. En ese momento, las menores tenían siete años de edad. No obstante, aproximadamente un mes y medio después, la peticionaria instó una solicitud para que se suspendieran las relaciones paterno-filiales. Alegó que, por disposición del tribunal, las menores estaban recibiendo terapia educativa con la Dra. Jeannette RossellÓ(1) y señaló que el recurrido, quien originalmente parti *406 cipo en el proceso terapéutico, había abandonado las terapias en noviembre de 2009. Además, la peticionaria adujo que tras varios incidentes suscitados durante las relaciones paterno-filiales, las menores estaban renuentes a relacionarse con su padre, cuya conducta iba presuntamente en detrimento del bienestar de las niñas. Así, pues, solicitó al tribunal que suspendiera temporalmente las relaciones paterno-filiales hasta tanto el recurrido se integrara a las terapias de las niñas y la terapeuta determinase que éstas estaban preparadas para relacionarse con él.
Como resultado de esta petición, las representantes legales de ambas partes y la Procuradora de Asuntos de Familia, como defensora judicial de las menores, acordaron reunirse con la doctora Rosselló, terapeuta de las niñas, para que ésta expresara su opinión profesional sobre las referidas relaciones paterno-filiales. Según surge de una moción informativa presentada por la Procuradora de Asuntos de Familia, la doctora Rosselló resaltó la importancia de que las menores se relacionasen con su padre. No obstante, recomendó que, previo a ello, se celebraran urnas relaciones terapéuticas iniciales entre las niñas y su padre en un ambiente neutral. Estas relaciones terapéuticas tendrían el propósito de restablecer el plan de relaciones paterno-filiales que las partes estipularon. Así las cosas, las partes acogieron las recomendaciones de la doctora Rosselló y estuvieron de acuerdo con que fuera ella quien dirigiera las referidas reuniones terapéuticas.
Posteriormente, luego de que se celebrara la primera reunión terapéutica, el recurrido presentó urna moción urgente ante el foro de instancia en la que expresó su incomodidad con el trabajo realizado por la doctora Rosselló. Cuestionó tanto su profesionalismo como su metodología, y alegó que el proceso terapéutico, en vez de ayudar a mejo *407 rar, había empeorado la situación.(2) Además, expuso que no se relacionaba con sus hijas desde enero de 2010. Así, pues, solicitó al foro primario que: (1) ordenara el restablecimiento de las relaciones paterno-filiales según estipuladas originalmente; (2) ordenara que a las menores se le hiciera una evaluación con un psiquiatra pediátrico y, de entenderlo necesario, comenzaran terapias; (3) cambiara a la terapeuta de las menores ya que el proceso terapéutico con esta no estaba siendo efectivo.
En oposición, la peticionaria señaló que si bien era cierto que las menores no se habían relacionado con su padre desde enero de 2010, esto se debía a la negativa de este a someterse al proceso de terapia de las niñas. De igual forma, insistió en la necesidad de que se celebraran las relaciones terapéuticas sugeridas por la doctora Rosselló y se reafirmó en su petición de que el tribunal suspendiera temporalmente las relaciones paterno-filiales hasta tanto la terapeuta determinara que las niñas estaban preparadas para relacionarse con su padre.
Examinados los escritos de ambas partes, el foro de instancia ordenó a la Procuradora de Asuntos de Familia que expresara su posición. Esta señaló que se le debía permitir a la doctora Rosselló llevar a cabo las sesiones terapéuticas conforme a su criterio profesional. Asimismo, señaló que hasta tanto la terapeuta no estableciera lo contrario, no recomendaba que las relaciones paterno-filiales se reanudaran sin la celebración previa de las sesiones terapéuticas.
El 1 de junio de 2010, el TPI, amparándose en los argumentos de la Defensora Judicial en el Informe Fiscal, denegó la solicitud del recurrido. Posteriormente, y reiterando su insatisfacción respecto a la gestión profesional de la doctora Rosselló, el recurrido le solicitó al TPI que lo autorizara a someter a las menores a una nueva evalua *408 ción psicológica, esta vez, ante un perito sometido por él. El TPI también denegó esta nueva solicitud del recurrido.
Inconforme, el recurrido acudió al foro apelativo intermedio, el cual confirmó las determinaciones del TPI. Sin embargo, aduciendo que el aquí recurrido había perdido la confianza profesional en la doctora Rosselló, el Tribunal de Apelaciones ordenó que las terapias dirigidas a restablecer las relaciones paterno-filiales se condujeran, no por la doctora Rosselló, sino por un perito designado por el TPI. Inconforme con la determinación del tribunal apelativo intermedio, la peticionaria acudió por primera vez ante nos mediante certiorari (CC-11-0913), el cual acogimos.
Así las cosas, el 30 de junio de 2011 revocamos al Tribunal de Apelaciones. Ordenamos que se celebrara una vista en la que se dilucidaran los méritos de la solicitud del aquí recurrido para que se sustituyera a la doctora Rosselló y se nombrara a un nuevo terapeuta que condujera las reuniones terapéuticas dirigidas a restablecer las relaciones paterno-filiales. En cumplimiento con lo ordenado, el TPI señaló una vista para el 24 de octubre de 2011. No obstante, en esa vista, las partes desistieron de la presentación de prueba y estipularon encomendar el proceso terapéutico de reanudación de las relaciones paterno-filiales a una trabajadora social privada, la Sra. Silvia Burgos. Esta, sin embargo, finalmente no estuvo disponible, por lo que el TPI designó al trabajador social Sr. Jari R. Moreno Sánchez (señor Moreno Sánchez).
Según surge de un Informe de 13 de enero de 2012, suscrito por el señor Moreno Sánchez, el 6 de enero de 2012 se celebró una reunión entre las menores y el padre. El señor Moreno Sánchez describió esta reunión como una en la cual las niñas compartieron con el padre satisfactoriamente. Sobre este particular, el Trabajador Social expresó que al inicio de la sesión las menores se mostraron muy apegadas a mamá —sujetándola fuertemente y abrazándola—, pero luego que la mamá salió de la sala de terapia, las niñas poco a poco se relacionaron con su padre de forma *409 más abierta y espontánea. En el Informe se señaló, además, que las niñas conversaron con el padre, e incluso le preguntaron sobre unos peces que estaban en su casa; que recibieron regalos del padre y se tomaron fotos con él. Sin embargo, indicó que al finalizar la sesión, las niñas volvieron a asumir un comportamiento poco expresivo y se observaron calladas o distanciadas hacia la figura paterna.
En el mencionado Informe se reportó, además, que en la segunda cita, programada para el 13 de enero de 2012, las menores se negaron a bajarse del auto de la madre, a entrar a la oficina del señor Moreno Sánchez y a relacionarse con el recurrido. Al describir lo sucedido en dicha ocasión, el Trabajador Social enfatizó en la importancia de la colaboración de la peticionaria en el proceso. Señaló el rol ejecutivo que esta asumió de forma pasiva y que esperaba que asumiera un rol activo, más enérgico del que había empleado hasta ese momento, en la dirección de restablecer las relaciones paterno-filiales. También el Trabajador Social resaltó que la peticionaria, por ser la madre custodia, tiene una responsabilidad mayor para que las relaciones con otros familiares se den y se lleven a cabo de una forma saludable.
A consecuencia de la situación surgida en la segunda reunión programada por el señor Moreno Sánchez, este y la doctora Rosselló presentaron un Informe conjunto el 16 de abril de 2012. En el mismo, ambos recomendaron que se detuviera el proceso de reanudar las relaciones paternofiliales; hicieron referencia a la necesidad de que los padres resolvieran mediante terapia los graves problemas de comunicación que confrontan, y que fueran estos quienes manejaran el proceso de reanudar las relaciones paternofiliales. Sobre este particular, en el último párrafo de su Informe, ambos profesionales señalaron que ante la indisposición de las menores, entendían que no era apropiado continuar con el proceso, pues las niñas se observan afectadas por la situación.
*410 Así, el señor Moreno Sánchez y la doctora Rosselló informaron que habían determinado detener momentáneamente las relaciones paterno-filiales, y recomendaron que se brindara un seguimiento en el área emocional de las niñas para que se trabajara con este asunto y con el trauma que todo esto pudiera estar ocasionando a las niñas. Por último, señalaron que esperaban que con el tiempo las niñas pudieran llegar a comprender la importancia que tiene mantener una relación saludable con su padre, y que estén en disposición positiva para verlo.
Como consecuencia de todo esto, el 1 de mayo de 2012, el TPI celebró una vista en la que señaló que había leído y analizado los informes presentados por los peritos; que se había reunido con los abogados de las partes en cámara; que había escuchado a las partes y había hecho un análisis exhaustivo del caso. Señaló que no habían propuestas concretas para resolver el impasse entre las partes y que la mejor manera de trabajar el problema era salir del escenario terapéutico para dar paso a un escenario relajado, con la presencia de algún recurso familiar aceptable para ambas partes y que permitiera el contacto inicial con el padre.
Por todo lo anterior, el 15 de junio de 2012, el TPI se trasladó y se constituyó en el área comedor del centro comercial San Patricio Plaza donde celebró una vista para observar un encuentro casual entre el recurrido y sus hijas. Como resultado de esa vista, el foro de primera instancia emitió una extensa y bien fundamentada Resolución en la que, entre otras cosas, describió lo ocurrido en el centro comercial. Señaló la juez de instancia que tan pronto las menores vieron a su padre se aferraron fuertemente al cuerpo de su madre y comenzaron a llorar, resistiéndose a hablar con el padre o a estar a su lado. Incluso, las menores no quisieron siquiera que el peticionario las tocara. Ninguna de las menores accedió a acercarse o permitir que el padre se les acercara o les hablara, a pesar de que ambas partes intentaron convencerlas. Así, y en lo pertinente, *411 el TPI concluyó en su Resolución lo siguiente, lo que citamos in extenso por su importancia:
A la luz de los hechos antes reseñados y del análisis doctrinal aplicable al caso de autos, resulta claro que desde el punto de vista estrictamente jurídico aquí no existe impedimento legal alguno para que el demandante pueda compartir con sus hijas en la forma en que originalmente [fue] estipulada por las partes. Así se desprende del hecho de que en ninguna instancia del trámite del caso se ha alegado ni demostrado que existan circunstancias de peligro o riesgo a la salud o seguridad de las niñas por razón de llevarse a cabo las relaciones patemofiliales. Sin embargo, es también un hecho innegable la resistencia o rechazo que las menores han presentado a dicha relación, y que esta situación ha ido “in crescendo” con el transcurso del tiempo, a pesar de las numerosas sesiones de terapia recibidas por las niñas con el propósito de reanudar las mismas.
Como puede apreciarse del historial del caso, estamos ante una muy penosa situación en la cual la relación de apego que existía entre el demandado y sus hijas, (que todos los expertos identificaron en la etapa temprana de este litigio) se ha ido transforma[n]do en una actitud de total rechazo y desvinculación de las menores con su padre, ello como resultado de la sucesión de disputas entre las partes durante y después del divorcio.
Contrario a lo que fuera la intención original de las partes de buscar ayuda profesional para que ellos y sus hijas pudieran lidiar con el ajuste al proceso de separación, lo cierto es que además de la naturaleza de la controversia, su duración, las actitudes desplegadas por las partes, el resultado de la intervención terapéutica se convirtió en una fuente adicional de conflicto. Dicha situación no solo ha impedido que se lograra un entendimiento entre las partes para poner fin al litigio, sino que ha ocasionado grave daño emocional a las menores. De ahí que el resultado neto del proceso haya sido que la prolongación de la ausencia de la relación paterno-filial ha producido un rechazo mayor de las niñas hacia el padre, la cual ha ido a la par con una mayor identificación, apego y hasta dependencia de las menores con la madre.
Según se desprende del resumen que hicimos del historial terapéutico familiar en este caso las hijas menores de las partes han sido sometidas a un largo y agobiante proceso terapéutico, en el cual han participado de numerosas entrevistas e intervenciones. Sin embargo, los resultados del mismo en la conducta de las niñas y de las partes revelan que el proceso se *412 ha tornado cuando menos inefectivo, si no contraproducente. Como cuestión de hecho, a pesar de que ha habido amplia y plena oportunidad para que las terapias rindieran frutos positivos, el proceso de reunificación familiar se encuentra estancado, y las reacciones y la conducta de las menores evidencian que no hay progreso. Resulta claro además, que el comportamiento de las menores refleja que no están manejando adecuadamente el proceso.
A nuestro juicio, la situación de estancamiento e inefectividad de este proceso obedece a varios factores, a saber: (1) la incapacidad de las partes para superar sus desavenencias personales y mantener a sus hijas fuera de la contienda; (2) la falta de un compromiso auténtico y proactivo de las partes para promover y facilitar las relaciones entre sí y las relaciones de las niñas con ambos padres; (3) la falta de cooperación de los miembros del núcleo familiar de una y otra parte no promueve ni facilita el logro de la meta de reunificación familiar; (4) la ausencia de un plan terapéutico individualizado y personalizado para atender las diferencias en personalidad de las niñas y su relación de hermanas, así como la conducta y la respuesta de cada una de ellas hacia la relación con el padre y la familia paterna; y (5) la ausencia de un plan que en algún momento incluyera actividades concretas dirigidas a la reanudación de las relaciones paterno-fíliales. Aunque todos estos elementos inciden en el resultado que hoy tenemos, no hay duda de que según han señalado los peritos en trabajo social, sicología y siquiatría que han intervenido en este caso, el factor de mayor peso y perjuicio ha sido la ausencia total de una comunicación respetuosa y responsable entre los padres durante todo el proceso de separación y de litigio. Apéndice del recurso, págs. 130-132.
Por esto, el foro de instancia determinó lo siguiente:
En consideración a lo anterior, en protección de los mejores intereses de las menores y como alternativa para la solución de esta compleja situación familiar, resolvemos lo siguiente:
1. Por entender que el extenso proceso terapéutico con la Dra. Jeannette Roselló se ha detenido y tomado inefectivo, y que al presente la relación del padre con las menores se ha deteriorado en lugar de progresar, ordenamos el cese de intervenciones de las menores con dicha terapeuta. Disponemos además, el cese de toda intervención pericial, ya sea evaluativa o terapéutica, con las menores, así como el proceso de reanudación de relaciones paterno-filiales en este momento y hasta tanto otra cosa disponga el Tribunal.
2. Se ordena a las partes iniciar de inmediato un proceso de *413 terapia dirigido a capacitarlos para establecer un proceso de diálogo efectivo que les ayude a derribar las barreras de comunicación que les afectan en el plano individual y en la relación con sus hijas.
3. Como parte del proceso terapéutico aquí ordenado, las partes prepararán un plan paulatino y escalonado de encuentros familiares dirigido a promover, facilitar y reanudar las relaciones paterno-filiales, sin intervención o interferencia de terceros.
A los efectos antes señalados, y para evitar controversias ulteriores entre partes con relación a la selección del profesional que conducirá el proceso terapéutico aquí dispuesto, se ordena a la Procuradora de Relaciones de Familia, que en el plazo de 5 días provea un listado de entre (3) y (5) posibles recursos para ofrecer dichos servicios, de los cuales el Tribunal seleccionará el (la) terapeuta. La Procuradora se asegurará de que los recursos sugeridos no tengan vínculo personal o profesional alguno con las partes.
Se señalará vista de seguimiento en [un] plazo de cuatro (4) meses para evaluar el progreso de las terapias entre las partes.
Cumplan las partes con lo ordenado por el Tribunal en el mejor interés y bienestar de sus hijas. (Énfasis suprimido). Apéndice del recurso, págs. 132-133.
II
La pregunta que tuvo ante sí esta Curia al evaluar la expedición de este recurso se resume en lo siguiente: ¿abusó de su discreción el foro inferior al ordenar el cese de toda intervención de la Dra. Jeannette Rosselló con las menores en este caso?
Es claro que, ante una controversia, impasse o circunstancia real, los tribunales de justicia, en su obligación de parens patriae y en la búsqueda del imperativo del “mejor bienestar” de un menor, tienen el poder no sólo de tomar la acción que tomó la honorable juez de instancia en este caso, sino, incluso, de imponer la asignación de un terapeuta en particular; decidir a qué escuela asistirá finalmente el menor; suspender provisional o permanentemente relaciones paterno o materno-filiales; remover menores de la custodia de sus padres; decidir sobre la *414 adopción o no adopción de mi menor; privar de la custodia a uno o a ambos padres, y hasta privarlos de patria potestad.(3)
En fin, nuestra jurisprudencia ha sido consecuente en sostener que en nuestra jurisdicción el interés del menor está revestido del más alto interés público y que los tribunales, en protección de ese interés y en el ejercicio del poder de parens patriae, tienen amplias facultades y discreción.(4) Ahora bien, de igual manera hemos establecido que ese poder no es irrestricto.(5) Es menester entonces, al evaluar la determinación de un tribunal de primera instancia en el uso de su poder de parens patriae, determinar si según las circunstancias o la prueba presentada, este no abusó de su discreción.
Los asuntos que se atienden en nuestras salas de familia son, sin duda, particulares y, de ordinario, complicados. Sin embargo, las complicaciones a las que se enfrenta un juez de familia son, en un sentido, muy diferentes a las que se consideran en otras salas de justicia. Esto, porque distinto en gran manera a los asuntos que se atienden en otras ramas del Derecho, los casos de familia envuelven derechos que se enmarcan en profundas emociones y sentimientos, que requieren del juez de familia, además de un fino conocimiento del Derecho, una gran sensibilidad humana y empatia. Controversias que requieren del o la juez la capacidad de mantener en todo tiempo el control de su caso, pero salvaguardando, a su vez, los derechos de las partes que llegan a su sala buscando la mayoría de las *415 veces, además de justicia, el desahogo de un torrente de emociones, muchas de ellas negativas. En un sinnúmero de ocasiones, las partes llegan a la sala del juez sin saber siquiera qué es lo que realmente quieren, o cuál es la verdadera motivación de su causa de acción. Entonces, le corresponde al juez discernir con fineza tal intención y enmarcarla dentro de lo que el Derecho provee. Cuando, para completar el cuadro, en medio de ese barrunto de emociones y sentires yace el mejor bienestar de uno o más menores, se requiere, además, del juez de familia, temple y sabiduría para escuchar a todos los recursos a su disposición, y actuar de manera firme pero sosegada.
Por otro lado, recordemos que en un sentido pragmático, las decisiones de un juez de familia casi siempre son “interlocutorias”, pues la mayoría de sus determinaciones nunca se constituyen en cosa juzgada.(6) Esto es, debido a los cambios en circunstancias, actuaciones o actitudes de las partes en un caso, un juez se puede mantener por años tomando decisiones sobre un mismo asunto. Así, con el tiempo, el juez de familia aprende a discernir con meridiana claridad no solo lo que encierran las controversias en cada caso, sino los personajes de cada drama de la vida real que tiene ante sí. Eso, difícilmente ocurre en otras salas de nuestra augusta Rama.
III
Al estudiar detenidamente el expediente del caso de autos, no albergo dudas con relación a que el TPI actuó en conformidad con el principio del mejor bienestar de las dos menores, y dentro de los parámetros de una sana discreción. Sin embargo, y como sabemos, la evaluación de lo que constituye el “mejor bienestar” de un menor parece ser un aspecto en lo que dos juzgadores rara vez puedan *416 ponerse cien por ciento de acuerdo. Al contrario, en ocasiones encontramos tantas opiniones como juzgadores intervengan. Esto, a mi manera de ver, obedece, en parte, precisamente a la carga emocional y la responsabilidad que conlleva para un juez decidir qué es lo mejor para una criatura que carece de la capacidad para valerse por sí misma, en contraposición con los intereses y sentimientos de las personas más cercanas. Sobre todo, cuando el juez discierne que esas personas cercanas, a pesar de sus ofuscaciones, realmente aman al menor.
En situaciones como las del caso de autos, la discreción ejercida por el juez de instancia debe ser aquilatada de acuerdo con las circunstancias y dentro del contexto de lo que es razonable.(7) O dicho de otro modo, los foros apelativos debemos analizar si, dentro de las circunstancias, la actuación del foro de instancia fue irrazonable. Ahora bien, para poder determinar si es irrazonable la acción tomada por un Tribunal de Primera Instancia, debemos tener claro cuál fue realmente la determinación tomada, y evaluarla, no aisladamente, sino en su contexto.
En la controversia del caso ante nuestra consideración, nótese que la decisión relacionada a la doctora Rosselló no fue la única tomada por la honorable juez de instancia. Ante una situación en la que —según el criterio de la juez que ha venido trabajando con diligencia el caso por largos meses o años— la situación de las menores lucía en un terrible deterioro, ésta decide detenerlo todo, incluso las relaciones paterno-ñliales. De manera que, según se puede interpretar de la Resolución en cuestión y de la totalidad del expediente, lo que la juez de primera instancia intenta hacer es lograr una composición de lugar.
Surge de la Resolución de la Juez que, aparentemente, las disputas entre los propios padres son las principales responsables del deterioro de la actitud de las niñas hacia su padre, y no necesariamente las terapias particulares *417 que la doctora Rosselló les ha venido ofreciendo. ¿Debió entonces la juez de instancia permitir que continuaran esas terapias que “nada” tenían que ver con el proceso para mejorar las relaciones paterno-filiales?
En primer lugar, no me parece real segmentar el proceso terapéutico de las menores al grado que podamos concluir que las terapias ofrecidas por la doctora Rosselló en nada se relacionan o tuvieran injerencia o efecto alguno —ya sea positivo o negativo— sobre las actitudes recientes de las menores para con el recurrido. Después de todo, y como lo señala la propia peticionaria, la intervención de la doctora Rosselló con las niñas se inicia como secuela de los serios problemas sobrevenidos por la separación de la pareja antes del divorcio. Siendo así, es lógico pensar que uno de los aspectos que trabajaría cualquier terapeuta en esas circunstancias es la relación de las menores con el padre ausente del hogar (relación patemo-filial), haciéndole en-tender que, aunque mamá y papá se han separado, ninguno de los dos se ha separado de ellas. Además, del expediente no surge que los servicios de la doctora Rosselló contratados inicialmente por la peticionaria tengan su génesis en alguna otra necesidad especial prexistente en las menores. Más bien, todo se ha relacionado siempre con el cuidado de la salud emocional de las niñas, luego de los conflictos surgidos con la separación de sus padres.
Por otro lado, consideremos, además, que en este caso el TPI no ha dado indicio de pasión, prejuicio o parcialidad con relación a la evaluación de los servicios o de las intervenciones de la doctora Rosselló en el caso. Al contrario, recordemos que en una ocasión, y antes de surgir esta nueva controversia, el recurrido le pidió a la honorable juez de instancia que sacara a la doctora Rosselló, y la juez se negó rotundamente. Entonces, el recurrido acude al Tribunal de Apelaciones y éste revoca la determinación del TPI, y deja fuera del caso a la doctora Rosselló. Inconforme, la peticionaria acude ante nos por primera vez y este Tribunal revoca al Tribunal de Apelaciones.
*418 En fin, ¿puede este Tribunal, a base del expediente de autos, determinar que la actuación de TPI fue producto de la pasión, el prejuicio, la parcialidad o un de error manifiesto? Entiendo que no. De acuerdo con las circunstancias, ¿tenemos base para determinar que la actuación del foro de instancia fue irrazonable? Nuevamente respondo en la negativa. Ciertamente, en este caso cabe decir lo siguiente:
Ese juez de instancia es, precisamente, el que ha estado por largo tiempo lidiando con esas dos personas, tratando de resolver esa impermisible e incomprensible situación. Dicho de otra forma, ese magistrado es el miembro de la Judicatura puertorriqueña que está en mejor posición de saber cuál es el mejor bienestar de ese menor, víctima inocente de esa situación de terquedad. No sabemos, a ciencia cierta, si la decisión que tomó el juez de instancia es la más correcta. Lo que sí sabemos es que está en mejor posición que cualquiera de los integrantes de este Tribunal para formar juicio al respecto. Dicho de otra manera, las intervenciones y el contacto que, personal y directamente este magistrado de instancia ha tenido con las partes le han permitido ir formando gradualmente una opinión sobre cuál es el curso de acción más beneficioso para el menor. (Enfasis en el original).(8)
Por todo lo anterior, estoy conforme con la decisión de este Tribunal.

 Según las propias alegaciones de la peticionaria, quien en el cuarto señalamiento de error del recurso que presentó ante este Tribunal el 2 de enero- de 2013 alegó que la doctora Rosselló ha sido la terapeuta de las menores “por más de cuatro (4) años” y, según surge del expediente, la intervención inicial de la doctora Rosselló con las menores fue prácticamente contemporánea con la orden del Tribunal de Primera Instancia en la cual se le designó como terapista de las menores. Dicha Orden *406 se dictó el 24 de octubre de 2008. Véase Apéndice del Recurso de certiorari, pág. 146. Es evidente, entonces, que en cualquiera que sea la capacidad que la doctora Rosselló ha intervenido con las menores, objeto de la controversia en este caso, la inmensa mayoría del tiempo lo ha hecho como recurso del Tribunal y bajo su jurisdicción.

 Cabe destacar que el recurrido es psiquiatra de profesión.

 Rivera Ríos, Ex parte, 173 DPR 678 (2008) (Sentencia); Rivera Báez, Ex parte, 170 DPR 678 (2007); Pena v. Pena, 164 DPR 949 (2005); Martínez v. Ramírez Tió, 133 DPR 219 (1993); Sterzinger v. Ramírez, 116 DPR 762 (1985); Nudelman v. Ferrer Bolívar, 107 DPR 495 (1978); Ortiz v. Vega, 107 DPR 831 (1978); Centeno Alicea v. Ortiz, 105 DPR 523 (1977); Marrero Reyes v. García Ramírez, 105 DPR 90 (1976); Rodríguez v. Gerena, 75 DPR 900 (1954); Fernández v. Martínez, 59 DPR 548 (1941); Picó v. Mejía, 52 DPR 728 (1938).

 Martínez v. Ramírez Tió, supra; Sterzinger v. Ramírez, supra; Ortiz v. Vega, supra.

 Pueblo v. Hernández Villanueva, 179 DPR 872 (2010); Pueblo v. Ortega Santiago, 125 DPR 203 (1990); Pueblo v. Sánchez González, 90 DPR 197, 200 (1964).

 Santana Medrano v. Acevedo Osorio, 116 DPR 298 (1985); Negrón v. Lugo, 59 DPR 870 (1942).

 Pueblo v. Hernández Villanueva, supra; Pueblo v. Ortega Santiago, supra; Pueblo v. Sánchez González, supra.

 Rivera Ríos, Ex parte, supra, págs. 686-687, Opinión disidente del Juez Asociado Señor Rebollo López.